Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
February 14, 2022

**2022 CO 7**

**No. 19SC763, *People v. Ojeda*—Peremptory Challenges—Equal Protection—Constitution and Selection of Jury.**

In this opinion, the supreme court reviews a split decision of a division of the court of appeals, holding that the trial court erred in denying Ojeda's challenge to an allegedly discriminatory juror strike under *Batson v. Kentucky*, 476 U.S. 79 (1986), during the jury selection process. The supreme court holds that because the prosecution offered an explicitly race-based reason for striking Juror R.P., it did not meet its burden of providing a race-neutral explanation for the strike, as required under step two of the *Batson* test. Accordingly, the judgment of the court of appeals is affirmed, albeit on other grounds.

**2022 CO 7**

**Supreme Court Case No. 19SC763**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 15CA1517

**Petitioner:**

The People of the State of Colorado,

v.

**Respondent:**

Ray Ojeda.

**Judgment Affirmed**
*en banc*
February 14, 2021

**Attorneys for Petitioner:**
Philip J. Weiser, Attorney General
Kevin E. McReynolds, Senior Assistant Attorney General
*Denver, Colorado*

**Attorneys for Respondent:**
Megan A. Ring, Public Defender
Elizabeth Griffin, Deputy Public Defender
*Denver, Colorado*

**JUSTICE BERKENKOTTER** delivered the Opinion of the Court, in which
**CHIEF JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE HOOD,
JUSTICE GABRIEL, JUSTICE HART,** and **JUSTICE SAMOUR** joined.

JUSTICE BERKENKOTTER delivered the Opinion of the Court.

¶1     We review a split decision of a division of the court of appeals in *People v. Ojeda*, 2019 COA 137M, 487 P.3d 1117, holding that the trial court erred in denying Ray Ojeda's challenge to an allegedly discriminatory jury strike under *Batson v. Kentucky*, 476 U.S. 79 (1986), during the jury selection process. We hold that because the prosecution offered an explicitly race-based[1] reason for striking Juror R.P., it did not meet its burden of providing a race-neutral explanation for the strike, as required under step two of the *Batson* test. Accordingly, we affirm the judgment of the court of appeals, albeit on other grounds.

## I. Facts and Procedural History

¶2     In 2013, Ojeda was charged with kidnapping, sexually assaulting, and shooting a fifteen-year-old girl back in 1997. The victim, who somehow survived, reported the crime immediately but could not identify the perpetrator. The investigation eventually stalled out. At some point in time, the Denver Police Department's Crime Lab misplaced the victim's rape kit. Years later, when the

---

[1] We recognize that bias on the basis of a person's Hispanic or Latino identity is ethnicity-based, not race-based. We use the term "race" here expansively to encompass the nature of both biases in keeping with the primary terminology employed by the parties and the division and used in the United States Supreme Court's precedents. *See Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 863 (2017).

police found and retested evidence from the victim's rape kit, DNA from the vaginal swab matched Ojeda.

¶3    At the beginning of Ojeda's trial in 2015, prospective jurors completed a written questionnaire that asked, among other things, whether they, a friend, or a relative had been the victim of a sexual assault; whether they had friends or relatives in law enforcement; and whether they or a family member had ever had a particularly good or bad experience with a police officer.

¶4    Juror R.P., a Hispanic[2] man, explained in his responses to the questionnaire that he and his ex-wife had been victims of sexual misconduct or assault, that he had a friend in law enforcement, and that he or a family member had been "racially profil[ed]." Because he answered the first question affirmatively, Juror R.P., like at least a dozen other jurors, was questioned individually by counsel outside the presence of the venire. He explained that the "inappropriate sexual behavior" to which he was subjected, as well as his ex-wife's separate experience, both occurred in the 1980s, before they were married. He indicated, in response to a question by the prosecution, that those experiences would not impact his ability to listen to the

---

[2] We use the term "Hispanic" in this opinion (in lieu of Latino) because both the trial court and the court of appeals used this term.

3

evidence or affect his judgment. Neither defense counsel nor the prosecution expressed any concern about Juror R.P.'s answers.

¶5 During group voir dire, the prosecutor asked Juror R.P. whether he had a "response in [his] gut" to the delay in bringing the case to trial. Juror R.P. said that the delay raised questions: "Maybe the person didn't disclose for some reason, the victim? Or maybe there was a mistrial before, or you know, something went awfully wrong for so many years to have gone by."

¶6 The prosecutor later asked eight of the prospective jurors to rate the criminal justice system on a scale of one to ten. Two jurors rated the system a four, three said it was a five or six, one rated it a six or seven, and two rated the system a nine or ten. Juror R.P. was one of two jurors who rated the system a four. Later, in response to a different line of questioning, Juror R.P. indicated that he had "a little bit of a bias on the system itself," explaining that he had "worked with communities of color," and he knew "that the criminal justice system is disproportionately filled with people of color and folks with mental disabilities." He stated that, while he would try not to let his views affect him as a juror, his feelings about the system might color the way he "hear[d] and weigh[ed] the evidence in the case."

¶7 At the conclusion of the group questioning, the prosecutor challenged Juror R.P. for cause. She stated that her challenge was based on the content of Juror

R.P.'s questionnaire, the remarks he made during general voir dire, and his demeanor. She explained that Juror R.P. expressed "bias" against the criminal justice system and "visibly showed hesitation" when asked whether he could be fair.

¶8     As for the questionnaire, the prosecutor observed that Juror R.P. worked in a field "ha[ving] to do with a quality of healthcare for individuals." Next, she turned to Juror R.P.'s voir dire comments, focusing on what she characterized as his "bias against the system." She construed this comment as an admission by Juror R.P. that his bias would "impact his ability to listen to both sides." She then summed up her concerns:

> And I believe that when you look at that in-court behavior against what is clearly his commitment to his job, in terms of serving people of color and what he talked about in terms of the defendant being a person of color—he is himself a person of color—I thought that the totality of the record indicated that he has a distinctive leaning, that he himself said he would have trouble listening to the evidence.

¶9     Defense counsel objected to the prosecutor's challenge, arguing that the prosecutor was mischaracterizing Juror R.P.'s answers. He then highlighted Juror R.P.'s statements that he could set his personal experiences aside, follow the rules provided by the court, and be objective. Defense counsel added that Juror R.P. was "one of the few Hispanic men on this entire jury panel," emphasizing that, under *Batson*, the prosecutor could not "exclude him just because he's Hispanic and may have something in common with the defendant in his heritage." The

5

prosecutor did not dispute defense counsel's characterization of the basis of her challenge.

¶10 The district court denied the prosecutor's challenge for cause, expressly rejecting the prosecution's assertion that Juror R.P.'s answers regarding his feelings or life experiences indicated that he would not follow the court's rules or reach a verdict based on the evidence. Specifically, the court found that Juror R.P. was "certainly entitled to believe that people of color are not well-served in our criminal justice or medical system." The court explained: "There's nothing in his answers that those feelings o[r] his life experience will affect his judgment in the case, that he won't follow the rules set forth by the Court. There's a completely inadequate record to challenge him in this case." It clarified, however, that it had not made any findings under *Batson*.

¶11 Not long thereafter, the prosecutor used a peremptory strike to excuse Juror R.P. Defense counsel, again, immediately raised a *Batson* objection, stating that he was "obviously concerned about excusing Hispanic males from the jury." Without waiting for the court to rule on whether defense counsel had made out a prima facie case of discrimination under the first step of *Batson*, the prosecutor proceeded to articulate her rationale for striking Juror R.P.

¶12 First, she expressly incorporated her comments related to her earlier for-cause challenge. Then, she elaborated on those comments, emphasizing the same

6

underlying theme. She told the court that Juror R.P. would be a bad juror for the prosecution in light of the weaknesses in the prosecution's case, including the evidence that the Denver Police Department and the Denver Crime Lab misplaced the victim's rape kit for a period of years. She explained that the prosecution anticipated vigorous cross-examination concerning the DNA evidence that was ultimately recovered from the rape kit and was concerned that Juror R.P.'s reservations about the system might make him more skeptical of the prosecution's evidence. The problem, the prosecutor explained after gathering her thoughts, was that because the "defendant is a Latino male," and Juror R.P., as a Hispanic male, had discussed his own concerns about being racially profiled, Juror R.P. might "steer the jury towards a race-based reason why" Ojeda was "charged in the case." The prosecutor added that the jury still included a man of Middle Eastern descent, a "gentleman who is literally, not metaphorically, but literally of African-American descent," another Black man, and a Hispanic man.

¶13    Defense counsel responded: "With respect to [Juror R.P.], I think [the prosecutor] made my argument for me. She's concerned about a race-based argument being made by [Juror R.P.] because he's Hispanic." The court overruled the *Batson* objection, explaining:

> The Court will deny the challenge for cause as to [Juror R.P.], but there are abundant race-neutral reasons for a peremptory to be exercised. First of all, he too is a victim of a sex assault, as is his wife, and he struck the Court as remarkably unconcerned about those events in his

7

own lifetime. His first thought when there was a discussion of the time [it has] taken to bring this case was that the victim had delayed disclosure. He does have an anti-law enforcement ben[t], so the Court finds there's a sufficient racially neutral basis for the challenge.

¶14 Following the court's ruling, the prosecutor added that she, too, had "taken a note" about Juror R.P.'s comments concerning the delay and that they were "of particular concern." The jury convicted Ojeda as charged, and the court sentenced him to 144 years in prison.

¶15 Ojeda appealed, and a split division of the court of appeals reversed. Judge Fox, writing for the majority, concluded that the trial court erred in denying Ojeda's *Batson* challenge. *Ojeda*, ¶ 34, 487 P.3d at 1126. Applying the "substantial motivating factor" approach to step three of the *Batson* analysis, Judge Fox concluded that the prosecutor was motivated in substantial part by discriminatory intent. *Id.* at ¶¶ 25–26, 487 P.3d at 1123–24. Judge Harris specially concurred, concluding that the prosecution did not meet its burden under step two of the *Batson* analysis to state a race-neutral reason for striking Juror R.P. *Id.* at ¶ 37, 487 P.3d at 1127 (Harris, J., specially concurring).

¶16 Judge Hawthorne dissented, concluding that the trial court's *Batson* analysis was inadequate and that *People v. Rodriguez*, 2015 CO 55, 351 P.3d 423, required the matter be remanded to the trial court with directions to conduct the three-step *Batson* analysis and to make the required factual findings. *Ojeda*, ¶ 80, 487 P.3d at 1133 (Hawthorne, J., dissenting).

8

¶17    We granted certiorari[3] and affirm on alternate grounds.

## II. Analysis

¶18    We begin by discussing the important equal protection principles that prohibit purposeful discrimination in the jury selection process.  We next outline the three-step test set forth in *Batson* for determining whether a party's use of a peremptory challenge is purposefully discriminatory.  Then, we discuss the standards of review that apply to each *Batson* step before taking a deeper dive into the cases from the United States Supreme Court and this court that provide the basic framework for our decision today.  Finally, we apply the relevant law to the facts before us.

---

[3] We granted the People's petition for certiorari review of the following issues:

1. Whether the court of appeals erred in applying *Batson v. Kentucky* by adopting an unprecedented "substantial motivating factor" test to override the trial court's conclusion that "abundant race-neutral reasons" supported a juror strike.

2. Whether the court of appeals erred by creating its own factual findings when unsatisfied with the trial court's instead of remanding for further proceedings as required in *People v. Rodriguez*, 2015 CO 55, 351 P.3d 423.

## A. Applicable Law

### 1. Equal Protection

¶19    The Equal Protection Clause of the Fourteenth Amendment forbids a challenge to a potential juror based solely on race.[4] *Batson*, 476 U.S. at 89; *see also People v. Wilson*, 2015 CO 54M, ¶ 10, 351 P.3d 1126, 1131 (explaining that the Equal Protection Clause prohibits race-based juror strikes).  Equal protection also forbids striking a juror based on the juror's gender.  *J.E.B. v. Alabama*, 511 U.S. 127, 129 (1994).  Purposeful discrimination in jury selection violates a defendant's right to equal protection because it denies the defendant the protection that a trial by jury is intended to secure: "The very idea of a jury is a body . . . composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds."  *Batson*, 476 U.S. at 86 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 308 (1879), *abrogated by Taylor v. Louisiana*, 419 U.S. 522 (1975)).  Equal protection also ensures litigants' and potential jurors' "right[s] to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice."  *J.E.B.*, 511 U.S. at 128.

---

[4] For the reasons outlined in footnote one, we use the term "race" expansively to include Hispanic ethnicity.  *Batson's* protections unquestionably extend to Hispanic jurors.  *See Hernandez v. New York*, 500 U.S. 352 (1991).

¶20    The harm from discriminatory jury selection reaches beyond that inflicted on the defendant and the excluded juror to touch the entire community. Juries are meant to protect life and liberty from wrongful exercises of power; permitting racial prejudice in jury systems damages both the fact and the perception of justice. *Peña-Rodriguez*, 137 S. Ct. at 868. Selection procedures that purposefully exclude jurors based on race or gender undermine public confidence in the fairness of our system of justice. *See, e.g.*, *Batson*, 476 U.S. at 87.

## 2. *Batson v. Kentucky*

¶21    To help secure these important rights, the Supreme Court outlined a three-step process in *Batson* for determining when a peremptory strike is discriminatory.[5]

## a. Step One

¶22    At step one, the objecting party must make a prima facie showing that the peremptory strike was based on the prospective juror's race. *Miller-El v. Cockrell*, 537 U.S. 322, 328 (2003) ("*Miller-El I*"); *Wilson*, ¶ 10, 351 P.3d at 1131. To raise the necessary inference of purposeful discrimination, the objecting party may rely on all relevant circumstances. *Batson*, 476 U.S. at 96. One example of a relevant

---

[5] The right to peremptory challenges in Colorado is statutory. *See* § 16–10–104, C.R.S. (2021).

circumstance that the *Batson* Court suggested is "a 'pattern' of strikes" against members of a cognizable racial group. *Id.* at 97. But a pattern is not essential to making a prima facie showing. "The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster v. Chatman*, 578 U.S. 488, 499 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)). "For evidentiary requirements to dictate that 'several must suffer discrimination' before one could object would be inconsistent with the promise of equal protection to all." *Batson*, 476 U.S. at 95–96 (quoting *McCray v. New York*, 461 U.S. 961, 965 (1983) (Marshall, J., dissenting from denial of certiorari)). Thus, as long as the totality of the relevant circumstances raises an inference of racial motivation, the objecting party has satisfied his or her step-one burden. *Id.* at 96; *accord Valdez v. People*, 966 P.2d 587, 589 (Colo. 1998).

### b. Step Two

¶23 The burden of production then shifts to the proponent of the strike. *Batson*, 476 U.S. at 97. At step two, the proponent must come forward with a race-neutral explanation "related to the particular case to be tried." *Id.* at 98. Examples include a prospective juror's out-of-court obligations, *see Snyder*, 552 U.S. at 478, prospective jurors' perceived abilities to listen and follow the interpreter, *see Hernandez*, 500 U.S. at 356, and a prospective juror's lack of ties to the community, *see Rice v. Collins*, 546 U.S. 333, 341 (2006).

¶24 Step two of the *Batson* analysis turns on the facial validity of the proponent's explanation. *Valdez*, 966 P.2d at 590. At this step, the striking party's "explanation need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97. All the striking party must do is provide any race-neutral justification for the strike, regardless of implausibility or persuasiveness. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). A race-neutral explanation is "an explanation based on something other than the race of the juror." *Hernandez*, 500 U.S. at 360; *see also People v. Mendoza*, 876 P.2d 98, 101 (Colo. App. 1994) (stating that at step two of a *Batson* analysis, a prosecutor must offer an explanation for the strike "based on something other than race"). Nothing more is required for the inquiry to proceed to step three. *See Purkett*, 514 U.S. at 768.

¶25 But if a discriminatory purpose is "inherent in the [proponent's] explanation," the reason offered cannot be deemed race-neutral. *Hernandez*, 500 U.S. at 360. This is why a proponent "may not rebut the defendant's prima facie case of discrimination by stating merely that he [or she] challenged jurors of the defendant's race on the assumption—or his [or her] intuitive judgment—that they would be partial to the defendant because of their shared race." *Batson*, 476 U.S. at 97.

¶26 In evaluating the race neutrality of the proponent's explanation, a court must determine whether, assuming the proffered reason for the peremptory

challenge is true, the challenge is based on something other than race, or whether it is race-based and, therefore, violates the Equal Protection Clause as a matter of law. *Hernandez*, 500 U.S. at 359.

### c. Step Three

¶27 At step three, after the objecting party has had a chance to rebut the proponent's race-neutral explanation, the trial court must decide the ultimate question: Whether the objecting party has established purposeful discrimination. *Batson*, 476 U.S. at 98. Under the United States Supreme Court's recent precedent, resolution of this question turns on the application of a substantial motivating factor test. *Flowers v. Mississippi*, 139 S. Ct. 2228, 2235, 2244 (2019); *Foster*, 578 U.S. at 512–13; *Snyder*, 552 U.S. at 485. Under this approach, a peremptory strike is purposely discriminatory for purposes of step three if the strike was "motivated in substantial part by discriminatory intent." *Flowers*, 139 S. Ct. at 2244 (quoting *Foster*, 578 U.S. at 513).

¶28 It is at this stage that "implausible or fantastic [step-two] justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768. As we discussed in *Wilson*, the trial court's step-three ruling should be based on its evaluation of the proponent's credibility and the plausibility of his or her explanation. *Wilson*, ¶¶ 13–14, 351 P.3d at 1132. If the trial court is convinced, in light of all the evidence, that the proffered reason was

14

pretextual and that the proponent's strike was motivated in substantial part by discriminatory intent, then it must uphold the *Batson* challenge. *Flowers*, 139 S. Ct at 2244; *Foster*, 578 U.S. at 513; *Snyder*, 552 U.S. at 485.

¶29 "It is the responsibility of the prosecution to provide its reasons supporting its peremptory strikes at step two of the *Batson* analysis, after the trial court rules that an inference of discrimination exists." *Valdez*, 966 P.2d at 592 n.11. For that reason, we have held that, in determining whether a racially discriminatory juror strike has occurred, trial courts may not offer up their "own plausible reasons behind the peremptory strikes at issue." *Id.*

## B. Standards of Review

¶30 "On appeal, each step of the trial court's *Batson* analysis is subject to a separate standard of review." *Rodriguez*, ¶ 13, 351 P.3d at 429. Step one is a "question of legal sufficiency over which the appellate court must have plenary review." *Valdez*, 966 P.2d at 591. As such, we apply de novo review "to a trial court's prima facie determination of the *Batson* analysis." *Id.* At step two, the issue is "the facial validity of the reason articulated by the [proponent]." *Id.* at 590. Because this is a question of law, we apply de novo review. *Id.* Step three requires the trial court to determine whether the opponent of the strike has satisfied its burden of proving purposeful racial discrimination. *Id.* Because this is an issue of fact, we review the trial court's step-three ruling for clear error. *Id.*

15

## C. Application

¶31    We begin with a more detailed examination of the record below and then turn to *Batson* and other pertinent cases to guide our consideration of these issues. Because we conclude that one of the prosecution's reasons for striking Juror R.P. was not race-neutral, we hold the trial court erred in overruling Ojeda's *Batson* challenge and affirm the division's judgment, although on different grounds.

### 1. The *Batson* Test as Applied to These Facts

¶32    To begin, there is no real dispute that Ojeda met his burden as to step one under *Batson*. When the prosecutor first attempted to excuse Juror R.P., defense counsel promptly asserted a *Batson* objection, noting his concern about excusing Hispanic men from the jury.

¶33    When shortly thereafter, the prosecution again attempted to excuse Juror R.P., this time with a peremptory strike, defense counsel renewed his *Batson* challenge. The prosecution immediately responded with an explanation regarding the challenged peremptory strike. It did not, at any point, argue that defense counsel failed to set forth a prima facie case. We interpret the prosecution's immediate response to the *Batson* objection as its acknowledgement that Ojeda met his burden under step one. We also conclude, based on the substance of defense counsel's argument, that Ojeda met his burden in this regard.

¶34    Next, we turn to step two. As we do so, we review, in greater detail, the state of the record leading up to the prosecution's *Batson* response. Recall that defense counsel asserted *Batson* challenges to both of the prosecution's efforts to excuse Juror R.P.

¶35    After the first *Batson* challenge, when the prosecutor attempted to excuse Juror R.P. for cause, she stated that she "found it to be significant" that Juror R.P. had "devoted his career to . . . a quality of healthcare for individuals." She told the court that Juror R.P., "himself a person of color," appeared to have a distinctive leaning, as evidenced by his discussion of the defendant being a person of color and his commitment to his career serving people of color. The trial court denied the prosecution's request, concluding that there was "a completely inadequate record to challenge Juror R.P. in this case," and that "[there was] no indication he couldn't follow my instructions and reach a verdict based on the evidence." The trial court specifically noted that it did not reach the *Batson* issue.

¶36    Not long thereafter, the prosecution again sought to excuse Juror R.P., this time with a peremptory challenge. Defense counsel reasserted his *Batson* objection. In response, the prosecutor specifically incorporated her unsuccessful argument regarding her challenge for cause. Then, she explained that the prosecution's strategy was focused on trying to select jurors who are "establishmentarian." She elaborated that the problem was that the "defendant is

17

a Latino male," and because Juror R.P. had discussed his own concerns about being racially profiled, Juror R.P., whom she described as a "polished, educated," and "persuasive individual," might then "steer the jury towards a race-based reason why" Ojeda was "charged in the case."

¶37 Defense counsel again countered that these reasons were overtly race-based: "With respect to [Juror R.P.], I think [the prosecutor] made my argument for me. She's concerned about a race-based argument being made by [Juror R.P.] because he's Hispanic."

¶38 The trial court denied the *Batson* challenge, identifying three race-neutral reasons to explain the strike—none of which were offered by the prosecution. First, that Juror R.P. was a victim of a sex assault, as was his ex-wife, and he seemed remarkably unconcerned about those events; second, that Juror R.P.'s first thought when discussing the time it took to get the case to trial was that the victim delayed disclosure; and, third, that Juror R.P. had an anti-law enforcement bent.

¶39 All three members of the division below, relying on *Valdez*, concluded that the trial court improperly supplied its own race-neutral reasons for the prosecutor's strike, although they each ultimately reached different conclusions as to how the trial court erred in denying Ojeda's second *Batson* challenge. *See Ojeda*, ¶ 13, 487 P.3d at 1121 (majority opinion) (citing *Valdez*, 966 P.2d at 592 n.11, for the proposition that a trial court may not supply its own race-neutral reasons for a

strike); *Id.* at ¶ 63, 487 P.3d at 1130 (Harris, J., specially concurring) (same); *Id.* at ¶ 104, 487 P.3d at 1137 (Hawthorne, J., dissenting) (same).

¶40 The People argue that all three members of the division erroneously concluded that the trial court provided its own race-neutral explanation for the strike. They contend that the trial court's ruling can, instead, be read to "implicitly credit" the prosecutor's explanation. They lean, as they did below, on *People v. Beauvais*, 2017 CO 34, 393 P.3d 509, in support of this assertion. We are unpersuaded.

¶41 In *Beauvais*, the defendant, who was female, asserted a *Batson* objection to the prosecution's use of peremptory challenges to excuse female potential jurors, arguing that the prosecutor's reasons for the strikes were pretextual. ¶ 7, 393 P.3d at 513. After hearing from both attorneys, the trial court found that the defendant had not established purposeful discrimination. *Id.* at ¶ 12, 393 P.3d at 515. The trial court did not make any specific credibility findings about the reasons proffered by the prosecutor in response to the *Batson* challenge. *See id.* On appeal, the majority of a division of the court of appeals concluded that the record was insufficient to facilitate review and remanded to the trial court to make specific step-three credibility findings about the prosecutor's three justifications for striking certain female potential jurors. *Id.* at ¶ 14, 393 P.3d at 515.

¶42 We reversed after concluding that an appellate court conducting a clear error review should defer to the trial court's step-three ruling "so long as the record reflects that the trial court weighed all of the pertinent circumstances and supports the court's conclusion" regarding purposeful discrimination. *Id.* at ¶ 32, 393 P.3d at 519. We viewed the record as sufficient to facilitate review and observed that, under certain circumstances, a trial court's ultimate decision to overrule a *Batson* objection can be taken as an "implicit crediting" of the prosecution's reasons and could, thus, survive clear error review. *Id.* at ¶ 27, 393 P.3d at 518.

¶43 But here, at step two of the *Batson* analysis, we apply de novo review. And here, importantly, the trial court did not *implicitly accept* the prosecutor's explanation. Rather, by supplying its own race-neutral reasons to justify the strike, the trial court *implicitly rejected* that explanation.

¶44 Moreover, by providing its own race-neutral reasons to explain the strike, the trial court answered the wrong question. The question under *Batson* is: Whether the prosecutor actually struck the potential juror based on race. By supplying its own reasons, the trial court instead answered whether there was some race-neutral explanation for the strike that could be gleaned from the record irrespective of the prosecutor's actual reason for doing so. *See Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) ("*Miller-El II*") (explaining that the focus is on the striking

20

party's stated reasons, regardless of whether "a trial judge, or an appeals court, can imagine a reason that might" withstand scrutiny). Thus, the trial court erred by supplying its own reasons for the peremptory strike.

¶45 The People next contend that the trial court's third justification—that Juror R.P. had an "anti-law enforcement ben[t]"—was not a new reason offered up by the trial court but, instead, simply another way of describing the prosecutor's argument regarding establishmentarian jurors. Even if this is so, it does not move the needle here because the inquiry at step two is whether—accepting what the prosecution said as true—the explanation for the strike was race-neutral or race-based.

¶46 Applying that standard, we conclude that the prosecution's explanation was based in part on Juror R.P.'s race. Here, the thread that runs through the prosecution's lengthy explanation was its overtly race-based concern that Juror R.P.—a polished, educated, persuasive Hispanic man, who the prosecution said voiced concern about racial profiling—might look to Ojeda who, like him, was a Hispanic man, and "steer the jury towards a race-based reason why" Ojeda was "charged in the case." Judge Harris explained the overtly race-based rationale for the prosecution's strike well:

> [The prosecutor] explicitly tied Juror R.P.'s race to his views on the justice system. It was not just that Juror R.P. had concerns about the system; it was also that he was a person of color, like the defendant, and the combination of those facts made it more likely that he would

21

find a "race-based" reason for the prosecution and then try to persuade the other jurors to adopt his view.

*Ojeda*, ¶ 69, 487 P.3d at 1131 (Harris, J., specially concurring).

¶47 At base, part of the prosecution's explanation boiled down to the suggestion that Juror R.P. might not give the prosecution a fair shake because of his race. *See Batson*, 476 U.S. at 104 (Marshall, J., concurring) (explaining that the exclusion of Black jurors cannot "be justified by a belief that [B]lacks are less likely than whites to consider fairly or sympathetically the State's case against a [B]lack defendant").

¶48 Though not dispositive here at step two, we also note that, contrary to the People's assertions, Juror R.P. (1) did not "talk[] about" the defendant being a person of color; (2) did not "talk about" or "make comments" regarding his own, or anyone else's, "concerns" about racial profiling; (3) did not "inject[] his personal views about racial profiling"; and (4) did not attribute his views regarding the justice system to his race. It was the prosecution that focused on the defendant and Juror R.P. as persons of color and then connected Juror R.P.'s race to his purportedly "anti-establishment" views. And in making this connection, the prosecution misattributed certain statements and views regarding race and racial profiling to Juror R.P. to argue that he might not consider the prosecution's case fairly because both he and Ojeda were Hispanic men.

¶49 On this record, we conclude that the prosecution did not meet its burden at step two of the *Batson* analysis to offer a race-neutral reason for striking Juror R.P.

22

## 2. What a Successful *Batson* Challenge Does Not Say

¶50    Today's conclusion is not a determination that the prosecutor here harbored ill will or animosity toward Juror R.P. or Ojeda, let alone all Hispanic people. Indeed, the objecting party need not show that a race-based strike was motivated by the proponent's ill will or animosity. While a lawyer's use of stereotypes in jury selection sometimes springs from overt racism, more often, their use reflects a misguided but "professional effort to fulfill the lawyer's obligation to help his or her client." *See Miller-El II*, 545 U.S. at 271 (Breyer, J., concurring). Of course, "the outcome in terms of jury selection is the same as it would be were the motive less benign." *Id.* To be sure, as relevant here, *Batson* must be strictly enforced to prevent any race-based strike. But a finding of discriminatory purpose based on race is not the same as a finding that the proponent of the strike is racist. And equating the two substantially undermines *Batson*. In fact, such a misunderstanding of *Batson* improperly ignores less blatant race-based strikes and raises the burden for the objecting party.

¶51    This mistaken assumption, in turn, may create a disincentive for sustaining *Batson* challenges by suggesting that a successful *Batson* objection is a declaration by the trial court that the person who exercised the strike—be it the prosecutor or defense counsel—is a bigot or is otherwise immoral. This potential disincentive is worse still at step three if we view a successful *Batson* challenge as a declaration

23

that the proponent of the strike is also a liar (because of the necessary finding that the proponent's explanation for the strike is pretextual). *See Beauvais*, ¶¶ 84–95, 393 P.3d at 529–31 (Márquez, J., dissenting).

¶52 Here, we emphasize that our conclusion that the prosecution did not meet its burden at step two of the *Batson* analysis is not a determination that the prosecution harbored any ill will toward Juror R.P., Ojeda, or Hispanic people. Nevertheless, given our conclusion regarding step two of the *Batson* analysis, Ojeda's conviction cannot stand.

### III. Conclusion

¶53 Because we conclude that the trial court erred at step two by denying Ojeda's *Batson* challenge, we affirm the judgment of the court of appeals.